**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
ANTHONY MAJER,                   :
                                 :
      Plaintiff,                 :   CIVIL ACTION NO. 06-2919 (MLC)
                                 :
      v.                         :   MEMORANDUM OPINION
                                 :
TOWNSHIP OF LONG BEACH, et al., :
                                 :
      Defendants.                :
_____:
```

**COOPER, District Judge**

Defendant Township of Long Beach ("Long Beach Township"), as well as individual defendants DiAnne C. Gove, Ralph H. Bayard, Francis A. Rowen, Ron Pingaro, and Richard J. Shackleton ("Individual Long Beach Defendants," collectively, "Moving Defendants") move for summary judgment.  The Court will grant the motion in part and deny it in part.

BACKGROUND

This case revolves around the practice of plaintiff, Anthony Majer, of placing "Open House – For Rent" signs in the public right-of-way of his residence.  After extensive proceedings (including a number of summary judgment motions), Majer entered into a Consent Order dismissing certain claims.  (Dkt. entry no. 41, Consent Order.)  Majer then filed a First Amended Complaint naming as defendants:  (1) Long Beach Township; (2) Gove, the Mayor of Long Beach Township and Long Beach Township Commissioner in charge of, <u>inter</u> <u>alia</u>, the Long Beach Township Zoning and Construction Department ("Zoning Department"); (3) Bayard, a Long

Beach Township Commissioner; (4) Rowen, a Long Beach Township
Zoning Officer and Zoning Department employee; (5) Pingaro, the
Zoning Department Director; (6) Shackleton, a lawyer serving as
the "Municipal Attorney" for Long Beach Township; and (7) E.J.
Kelly, Majer's neighbor.  (Dkt. entry no. 42, First Am. Compl. at
¶¶ 9-14; dkt. entry no. 44, Moving Defs.' Answer at ¶¶ 6-10.)

The First Amended Complaint contains six claims:  (1) the
Individual Long Beach Defendants, acting in their individual
capacities under color of state law, violated 42 U.S.C. § 1983
and the First Amendment of the United States Constitution "by
retaliating against him for making complaints about his neighbor
and about the Township's selective enforcement of its signage and
right-of-way laws and its gross negligence in protecting the
public safety"; (2) Long Beach Township is liable for its "policy
or custom of retaliatory practices instituted, implemented, and
encouraged by the individual defendants, whose acts or edicts
represented official policy"; (3) all defendants violated the New
Jersey Civil Rights Act, N.J.S.A. § 10:6-1, et seq., and the New
Jersey Constitution through their acts of unlawful retaliation;
(4) two or more of the defendants engaged in an unlawful civil
conspiracy to violate Majer's civil rights; (5) E.J. Kelly
assaulted Majer on June 30, 2005; and (6) E.J. Kelly's "conduct
constitutes the tort of intentional infliction of emotional
distress".  (First Am. Compl. at ¶¶ 60, 64, 67-69, 72, 75-76,
79.)  Majer claims that he has suffered harm in the form of loss

of rental income, emotional distress, psychological trauma, and pain and suffering. (<u>See generally</u> <u>id.</u>) He accordingly seeks, among other things, an order directing the defendants to cease and desist their acts of harassment and retaliation, compensatory damages, and punitive damages. (<u>Id.</u> at 14-15.)

E.J. Kelly is not a party to the pending motion for summary judgment, but the motion implicates a number of alleged incidents of retaliation committed by municipal officials and agents over an extended period of time. Given the parties' familiarity with the underlying factual allegations, the Court will not explore them in detail; specific factual assertions and examples will be addressed where appropriate. However, the Court will summarize the various municipal ordinances and policies that allegedly govern the posting of real estate signs.

In or about June 1996, a former Long Beach Township Mayor instituted a program known as "the Temporary Open House Sign Trial", or the "Sign Trial." (<u>See, e.g.</u>, dkt. entry no. 47-5, Aff. of Mark M. Tallmadge, Esq. ("Tallmadge Aff."), Ex. C, Sign Trial & Ex. H, Pingaro Dep. at 16-17.) The Zoning Department document authorizing this program stated that "[i]t will be permissible to have a portable sign at the street end with a directional arrow on it and another portable sign at the open house property." (Sign Trial.) The signs "should be informational and to the point," balloons and other adornments were expressly forbidden, and, while double-sided and "'A' frame type" double signs were permitted, the

portable sign could be no larger than "normal real estate signs."
(Id.)  The document concluded:  "There is no particular end date
to this trial.  If everyone cooperates and there are no complaints,
we will continue the trial without a specific end date."  (Id.)

At the time the Sign Trial was instituted, the Long Beach
Township Sign and Zoning Ordinances:  "(1) prohibited A-frame
signs, except under certain limited circumstances; (2) prohibited
signs of any kind in the public right-of-way; and (3) required
that all signs be placed within the property line of the subject
property and at least 10 feet back from the curb."  (Dkt. entry
no. 47-3, Moving Defs.' Statement of Undisputed Material Facts
("Defs.' Facts Statement"), ¶ 13 (citing Tallmadge Aff., Ex. D,
Long Beach Township Sign Ordinance Excerpt, & Ex. E, Long Beach
Township Zoning Ordinance Excerpt).)  It is uncontested that the
Sign Trial was not formally codified by Long Beach Township's
governing body, the Board of Commissioners, as an official
ordinance.  (See, e.g., id. at ¶ 14.)  However, the Sign Trial
evidently remained in effect for some time.

A meeting was conducted on September 29, 2005, after Majer
complained about alleged mistreatment by municipal authorities.
(See, e.g., Tallmadge Aff., Ex. A, Majer Dep. at 141-47, & Ex. R,
Shackleton Dep. at 13-17.)  This meeting was held at the law
offices of Shackleton & Hazeltine.  (See, e.g., id.)  Several
people attended, including Majer, his legal counsel at that point

in time, Rowen, and Shackleton himself.  (<u>See, e.g.</u>, Majer Dep.
at 141-47; Rowen Dep. at 39-40.)

In an October 4, 2005 letter to real estate brokers, the
Zoning Department stated:

> For some years it has been the practice of Long Beach
> Township, on the trial basis, to permit real estate
> offices to use portable signs at **street ends** to
> advertise "Open Houses" over weekends.  ***We REGRET that
> this will no longer be permitted.***

> Please be advised that as of October 15, 2005, no more
> signs advertising "Open Houses" at **street ends** will be
> permitted and all "For Sale", or "For Rent", or any
> "Real Estate Signs" will have to comply with the
> standards established in Chapter 160 [the Sign
> Ordinance] and Chapter 205 [the Zoning Ordinance] of the
> revised general ordinances of the Township of Long Beach.

(Tallmadge Aff, Ex. S, 10-4-05 Letter.)

But real estate brokers evidently complained about the Sign
Trial revocation.  (<u>See, e.g.</u>, Rowen Dep. at 44.)  After further
discussions and in apparent conformity with the applicable
procedural requirements, the three-member Board of Commissioners
(consisting of Gove, Bayard, and Robert A. Palmer) unanimously
adopted Ordinance No. 05-30C on November 4, 2005.  (<u>See, e.g.</u>,
Tallmadge Aff., Ex. CC, Gove Dep. at 73-75, & Ex. X, Ordinance
No. 05-30C.)  The Zoning Ordinance was amended as follows:

> **§ 160-24 Q** of an ordinance entitled, "Code of the Township
> of Long Beach, County of Ocean, State of New Jersey,
> 1997" is hereby amended by the addition of the following:
> **OPEN HOUSE SIGNS:**  Open House Signs, in order to be
> exempt, shall comply with the requirements for real
> estate signs above set forth except:

> a.  Open House Signs shall advertise only property for
> sale and not property for rent.

> b.  The Open House advertised by an Open House Sign shall be for a maximum period of forty-eight (48) hours per event.
> c.  An Open House Sign utilized as a directional sign may be placed in the public right-of-way, provided that it does not obstruct the free passage of pedestrians or lawfully operated vehicles and further are not placed in such a manner as to cause corner sight obstructions.
> d.  No Open House Sign shall be permitted on any median.
> e.  No Open House Sign shall have attached thereto balloons, flags, or any other attention attracting attachments of any sort, kind nor description.
> f.  Open House Signs may only be displayed from 8:00 A.M. to 5:00 P.M. on the two days of a permitted Open House event.

(Ordinance No. 05-30C at 1.)

Officials from the Ocean County Prosecutor's Officer offered in January 2006 their opinion that Ordinance No. 05-30C may be unconstitutional insofar as it prohibits "Open House - For Rent" signs yet permits "Open House - For Sale" signs. (See, e.g., Gove Dep. at 98-102.)  The Long Beach Township Board of Commissioners thereafter adopted Ordinance No. 06-04C, which eliminated the distinction between signs advertising property for sale and for rent.  (Tallmadge Aff., Ex. DD, Ordinance No. 06-04C.)

The Moving Defendants now move for summary judgment.  (Dkt. entry no. 47, Mot. for Summ. J.)  The motion is supported by a brief (dkt. entry no. 47-1, Long Beach Defs.' Br. in Supp. of Mot. for Summ. J. ("Defs.' Br.")), a Statement of Undisputed Material Facts (Defs.' Facts Statement), and three affidavits with exhibits (dkt. entry nos. 47-3 to 47-14.)  Majer filed an opposition brief (dkt. entry no. 52, Pl.'s Br. in Opp'n ("Pl.'s Br.")), a factual

6

statement (dkt. entry no. 52-13, Pl.'s Statement of Material
Facts), and several supporting exhibits and a certification (dkt.
entry nos. 52-1 to 52-12). The Moving Defendants filed a reply
brief (dkt. entry no. 53, Long Beach Defs.' Reply Br. in Further
Supp. of Mot. for Summ. J. ("Defs.' Reply Br.")) as well as a
Response to Plaintiff's Statement of Undisputed Material Facts
(dkt. entry no. 53-1, Moving Defs.' Resp. to Pl.'s Statement of
Undisputed Material Facts). The Court heard oral argument on the
motion. (Dkt. entry no. 56, Minute Entry.)

DISCUSSION

## I.   The Motion for Summary Judgment

The standard for a motion for summary judgment is well-
settled. Federal Rule of Civil Procedure 56(c) provides that
summary judgment is proper if the pleadings, the discovery and
disclosure materials, and any affidavits show that there is no
genuine issue as to any material fact and that the movant is
entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In
making this determination, the Court must "view[] the record in
the light most favorable to the non-moving party and draw[] all
inferences in that party's favor." United States ex rel.
Josenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009)
(citing Abramson v. William Patterson Coll., 260 F.3d 265, 276
(3d Cir. 2001)).

The summary judgment motion raises complex and fact-specific
issues. The Court must consider whether: (1) the record raises

genuine issues of material fact as to the elements of a constitutional retaliation claim, especially the element of causation; (2) Shackleton was not acting under color of state law and is otherwise entitled to the benefit of New Jersey's litigation privilege; (3) Gove and Bayard should be granted summary judgment on the grounds of legislative immunity; (4) Rowen and Pingaro are entitled to qualified immunity; (5) there are genuine issues of material fact as to whether Long Beach Township itself is liable due to an alleged municipal policy or custom; and (6) the state law claims, including the claim for civil conspiracy, are viable.  The parties themselves have thoroughly argued these issues both in their briefing and at an oral hearing before this Court.  In turn, we need not explore every argument and factual aspect of every issue in order to dispose of the pending motion.  For the following reasons, the Court will deny the motion except as to the individual-capacity claims against Gove and Bayard, which are barred under the doctrine of legislative immunity.

## II.  Prima Facie Case of Retaliation

We must first address whether there is a viable claim for unconstitutional retaliation.  The Moving Defendants argue that they are entitled to summary judgment because:  (1) the alleged actions, even when viewed cumulatively, fail to rise to the level of a constitutional violation; and (2) there is no causal connection between such actions and Majer's allegedly protected

8

conduct.  (See, e.g., Defs.' Br. at 48-57; Defs.' Reply Br. at
26-28.)  But Majer contends that there are genuine issues of
material fact as to both the nature of the Moving Defendants'
alleged misconduct as well as the element of causation.  (See,
e.g., Pl.'s Br. at 48-56.)  Viewing all of the evidence in the
light most favorable to Majer, we agree with Majer.

It is uncontested that "an individual has a viable claim
against the government when he is able to prove that the
government took action against him in retaliation for his exercise
of First Amendment rights."  Anderson v. Davila, 125 F.3d 148,
160 (3d Cir. 1997).  As the Moving Defendants assert, "[a]
plaintiff claiming retaliation under the First Amendment must
allege and prove: '(1) constitutionally protected conduct, (2)
retaliatory action sufficient to deter a person of ordinary
firmness from exercising his constitutional rights, and (3) a
causal link between the constitutionally protected conduct and
the retaliatory action.'"  (Defs.' Br. at 49 (quoting Thomas v.
Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006)); see Pl.'s
Br. at 49 (quoting same).)

As Majer points out (see, e.g., Pl.'s Br. at 49), the Moving
Defendants do not appear to contest that Majer was engaged in
constitutionally protected First Amendment conduct.  It appears
undisputed that Majer repeatedly spoke out about the actions of
his neighbor, E.J. Kelly, as well as of the Moving Defendants

9

themselves.  Instead, the Moving Defendants turn to the second
and third elements of the retaliation claim.  (See, e.g., Defs.'
Br. at 48-57; Defs.' Reply Br. at 26-28.)

### A.   Retaliatory Conduct

Both sides recognize (see, e.g., Defs.' Br. at 49; Pls.' Br.
at 49-52; Defs.' Reply Br. at 26) that a plaintiff must show that
a defendant engaged in retaliatory conduct that would be
"sufficient to deter a person of ordinary firmness from exercising
his First Amendment rights."  McKee v. Hart, 436 F.3d 165, 170
(3d Cir. 2006) (quoting Suppan v. Dadonna, 203 F.3d 228, 235 (3d
Cir. 2000)).  The Moving Defendants, among other things, argue
that the allegedly retaliatory actions at issue could not meet
this requirement because "plaintiff was clearly not deterred from
exercising his free speech rights" (Defs.' Br. at 50), as he
continued to complain about his neighbor and the actions of the
Moving Defendants, persisted in putting up signs, and was not
otherwise damaged or harmed by the alleged actions (see, e.g.,
Def.'s Br. at 40-57).  But they offer no legal support for their
theory that public officials must be totally successful in their
efforts to suppress the exercise of constitutional rights in
order for the plaintiff to have a viable claim for retaliation.

Majer properly observes that there is an expansive
understanding of how severe an adverse action must be to give
rise to a claim for retaliation.  (See, e.g., Pls.' Br. at 49-52.)

Accordingly, "[t]he effect of the alleged conduct on the
[government] employee's freedom of speech '"need not be great in
order to be actionable,"' but it must be more than de minimis."
McKee, 436 F.3d at 170 (quoting Suppan, 203 F.3d at 235).  Majer
offers a number of examples of actionable conduct (Pls.' Br. at
50-51), such as a low performance ranking and other petty acts of
harassment resulting in a government employee suffering emotional
distress, Suppan, 203 F.3d at 234-35.  In fact, the Supreme Court
has gone so far as to observe that "'the First Amendment . . .
protects state employees not only from patronage dismissals but
also from "even an act of retaliation as trivial as failing to
hold a birthday party for public employee . . . when intended to
punish her for exercising her free speech rights."'" Id. at 234
(quoting Rutan v. Republican Party, 497 U.S. 62, 76 n.8 (1990));
see O'Connor v. City of Newark, 440 F.3d 125, 128 (3d Cir. 2006)
(quoting Suppan, 203 F.3d at 234-35); Toscano v. Bor. of
Lavallette, No. 04-4412, 2006 WL 1867197, at *3 (D.N.J. June 30,
2006).

        Some if not all of the incidents alleged here appear to be
minor.  Also, this action differs from a case of alleged
retaliation against a government employee.  Nevertheless, the
Moving Defendants do not appear to argue that the principles
developed in the employment context are inapplicable where the
plaintiff is a private citizen.  Taking such principles into
account, there are genuine issues of material fact as to whether

at least some, if not all, of the alleged actions of the Moving Defendants would "deter a person of ordinary firmness from exercising his First Amendment rights." McKee, 436 F.3d at 170. The record includes evidence that: (1) Majer was issued violation notices and a summons as to his practice of posting "Open House – For Rent" signs (see, e.g., dkt. entry no. 5, Certif. of Steven Siegler ("Siegler Certif."), Ex. J, Violation Not. issued 6-28-05 ("Notice of Violation"), Ex. S, Letter dated 10-19-05, & Exs. FF & GG, Long Beach Township Police Department Records ("Summons")); (2) his signs were removed from his property on several occasions (see, e.g., Pingaro Dep. at 35); and (3) several police cars were dispatched to his home on a Sunday evening in order to check on a Health Code violation (see, e.g., Majer Dep. at 106-09). Even if the incidents at issue may not appear serious on their own, summary judgment should still be denied because of their possible cumulative effect. See, e.g., McKee, 436 F.3d at 169-71.

**B.   Causation**

The Moving Defendants assert that they are entitled to summary judgment on the retaliation claims because "plaintiff's reliance on temporal proximity and the 'timeline of events' to establish a causal link is flawed insofar as none of the moving defendants' actions are in any way linked to plaintiff's alleged protected conduct." (Defs.' Reply Br. at 26.) But we conclude that there are genuine issues of material fact as to the causation element.

It does appear that the record contains no direct and
unambiguous evidence of causation, such as a letter from one of
the Moving Defendants expressly admitting that retaliatory action
was taken against Majer.  In turn, the Moving Defendants deny any
improper motive or animus on their part and offer explanations
for the alleged conduct.  (See, e.g., Defs.' Br. 48-57; Defs.'
Reply Br. at 26-28.)  They further point to certain alleged
deficiencies in the causation theories offered by Majer, such as
the amount of time that elapsed between the start of his dispute
with E.J. Kelly and the first alleged retaliatory act.  (See,
e.g., id.)  Asserting that Majer offers mere speculation, the
Moving Defendants generally attempt to characterize the actions
taken against him as justifiable and otherwise appropriate steps
to enforce the municipality's ordinances.  (Id.)

Many of the assertions made by the Moving Defendants appear
reasonable, and may ultimately persuade the trier of fact to find
in their favor.  But on a motion for summary judgment, our role is
not to weigh the evidence and determine the truth of the matter
but to determine whether there is a genuine issue for trial.  In
particular, Majer is not required to present a "smoking gun" of
either retaliatory animus or retaliatory causation in order to
defeat summary judgment.

The Moving Defendants take issue with Majer's reliance on
evidence regarding the nature and characteristics of Long Beach

13

Township itself, going so far as to claim that Majer relies "on inflammatory rhetoric." (Defs. Reply Br. at 3.)  They assert that "[r]eferring to individuals as 'yacht club buddies' or 'softball buddies' and stating 'it's a small island' is meaningless." (Id. at 3.)  We agree that, standing alone, such considerations would be insufficient to defeat a motion for summary judgment.  But the alleged incidents at issue cannot be considered in a vacuum.

According to the Moving Defendants, "discovery has revealed that the individual Long Beach defendants did not know plaintiff or his neighbor . . . prior to the ordinance dispute" and also "confirmed" that they "did not know defendant [E.J.] Kelly's brother, Township Department of Public Works employee, Timothy Kelly, other than to recognize him as a Township employee, and that they never spoke to Timothy about plaintiff's dispute with Eugene." (Defs.' Br. at 48.)  In fact, "Timothy himself was not aware of those disputes." (Id. (citing Tallmadge Aff., Ex. FF, Dep. of Timothy Kelly ("Timothy Kelly Dep.") at 31-32).)  But the nature of the community here does put the Moving Defendants' factual assertions into a broader context.  This appears to be a relatively small, close-knit core of long-time or life-time residents of a resort town.  E.J. Kelly and his brother are natives of Long Beach Township, with their family living on the island for three-quarters of a century. (See, e.g., Seigler Certif., Ex. D, E.J. Kelly Dep. at 6-14, 21-22.)  The record

14

indicates that E.J. Kelly has many ties with Long Beach Township officials and employees.  (See generally E.J. Kelly Dep.; Timothy Kelly Dep.)  In contrast, Majer is a newcomer.  There is also evidence showing that E.J. Kelly threatened Majer with his purported municipal connections, stating, for instance, that "'his family has been on the Island since 1929 and you don't know who you're messing with'" (Siegler Certif., Ex. F, Crim. Compl. Against E.J. Kelly at E6), and that "[Majer] won't be able to rent his property anymore" (id., Ex. H, Majer's Voluntary Police Statement Against E.J. Kelly at A8).

We further find that some of the alleged incidents at issue cannot be explained away at the summary judgment stage as "mere 'coincidence.'"  (Pl.'s Br. at 65.)  The alleged sequence of events apparently calls into question the Moving Defendants' theory that the various actions against Majer constituted nothing more than the proper and even-handed adoption and enforcement of municipal policies and ordinances.

For instance, the police, including one of E.J. Kelly's acquaintances, immediately responded to his complaint about Majer, even though the Township Health Officer testified that the issue of whether someone has a bathroom in an abode would not normally warrant police involvement.  (See, e.g., Tallmadge Aff., Ex. N, Dep. of Timothy Hilferty at 40; E.J. Kelly Dep. at 21-22; Majer Dep. at 106-09.)  Also, Majer's "Open House - For Rent" signs were

15

removed, even though there is evidence in the record pointing to
the existence of a trial program permitting such signs as well as
a failure to enforce the signage and right-of-way restrictions as
to other properties.  (See, e.g., Majer Dep. at 90-91; Pingaro
Dep. at 35; Siegler Certif., Ex. K, Photograph Index; Sign Trial.)
Majer allegedly was issued a Notice of Violation designed
specifically for him.  (See, e.g., Rowen Dep. at 23-24.)  Pingaro
also admitted that his removal of Majer's signs constituted the
first and only time he had personally taken signage from a
property.  (See, e.g., Pingaro Dep. at 37.)  As explained infra,
additional evidence indicates that Shackleton, even though he was
allegedly a private attorney hired by Long Beach Township to
provide legal services, unilaterally ordered the termination of
the Sign Trial when confronted with Majer's complaints.  (See,
e.g., Majer Dep., at 141-44; 10-4-05 Letter.)  In turn, the Board
of Commissioners passed an ordinance amendment expressly
permitting "Open House - For Sale" signs but not "Open House -
For Rent" signs.  (See, e.g., Ordinance No. 05-30C.)  Although it
appears that the question of whether Ordinance No. 05-30C itself
violated the First Amendment is not directly before us, we note
that the timing of the amendment, the evidence showing that Majer
was, at the very least, one of only a handful of individuals who
ever displayed "Open House – For Rent" signs, and the fact that
the amendment was thereafter revised based on the constitutional

16

objections of the Ocean County Prosecutor's Office raise genuine issues of material fact as to whether the amendment itself constituted a retaliatory act.  (See, e.g., Gove Dep. at 98-102; Majer Dep. at 75-79.)

Given these considerations, a reasonable finder of fact could find that Majer, as an outsider in a heated dispute with a life-long resident, was the target of selective and unjustified enforcement actions on account of his protected activities.  We therefore will deny summary judgment on the element of causation.

### III. The Claims Against Shackleton

Summary judgment is sought on the claims against Shackleton on two grounds:  (1) as the Municipal Attorney for Long Beach Township, he did not act under color of state law; and (2) he is entitled to the protections of New Jersey's doctrine of absolute litigation immunity.  (See, e.g., Defs.' Br. at 30-40; Defs.' Reply Br. at 9-15.)  Majer responds that there are genuine issues of material fact.  (See, e.g., Pls.' Br. at 40-48.)  We conclude that summary judgment must be denied here.

#### A.   Under Color of State Law

To establish a violation of § 1983, the plaintiff must show a violation of a federal constitutional right and establish that the violation was committed by a person acting under color of state law.  See Angelico v. Lehigh Valley Hosp., 184 F.3d 268, 277 (3d Cir. 1999).  It appears uncontested that, unlike the other

Moving Defendants, Shackleton is not an official or employee of Long Beach Township.  On the contrary, he is a private attorney who was retained to provide legal services to Long Beach Township as its Municipal Attorney or Solicitor.  (See, e.g., Shackleton Dep. at 10-13.)  Accordingly, the threshold question is whether his conduct may be "fairly attributable" to Long Beach Township. Angelico, 184 F.3d at 277.  This type of issue must be addressed on a case-by-case basis.  See Conklin v. Warrington Twp., No. 06-2245, 2008 WL 2704629, at *6 (M.D. Pa. Jul. 7, 2008).

A person may be found to be a state actor when: "(1) he is a state official, (2) he has acted together with or has obtained significant aid from state officials, or (3) his conduct is, by its nature, chargeable to the state."  Angelico, 184 F.3d at 277 (internal quotations omitted).  But "[a]ttorneys performing their traditional functions will not be considered state actors solely on the basis of their position as officers of the court."  Id. Citing to Development Group, LLC v. Franklin Township Board of Supervisors, No. 03-2936, 2004 WL 2812049 (E.D. Pa. Dec. 7, 2004), Majer contends that an otherwise private attorney's identification as "Township Solicitor" indicates that he or she is a state actor acting under color of law.  (Pl.'s Br. at 43-44.)  But we agree with the Moving Defendants that Majer "must offer more than the fact that Mr. Shackleton may have identified himself at some point as the 'Township Solicitor.'"  (Defs.' Reply Br. at 12.)

18

Several courts have rejected the theory that a lawyer's role as a solicitor or municipal attorney automatically makes him or her a state official or actor.  See e.g., Conklin, 2008 WL 2704629, at *7 n.11; Willis v. Carroll Twp., No. 07-949, 2008 WL 644762, at *5 (M.D. Pa. Mar. 5, 2008); Spradlin v. Bor. of Danville, No. 02-2237, 2005 WL 3320788, at *3 (M.D. Pa. Dec. 7, 2005), aff'd, 188 Fed.Appx. 149 (3d Cir. 2006); O'Hanlon v. City of Chester, Nos. 00-0664 & 00-5617, 2002 WL 393122, at *3 (E.D. Pa. Mar. 12, 2002).[1]

The determination of whether Shackleton may be held liable under § 1983 depends on whether he was acting as an attorney. Attorneys performing "their traditional functions" will not be considered state actors.  Angelico, 184 F.3d at 277.  An attorney thus will generally not be liable for rendering advice, drafting correspondence on behalf of a client as to legal disputes, and otherwise engaging in litigation and equivalent legal activities. See id. at 276-78; Willis, 2008 WL 644762, at *5-*6; O'Hanlon, 2002 WL 393122, at *4-*7.  It further appears that, as to whether the attorney acted together with government officials, he or she

---

[1]  The Development Group court did not fully discuss the "Township Solicitor" title, and instead emphasized the existence of genuine issues of material fact as to whether an attorney jointly participated or conspired with municipal officials.  Dev. Group, 2004 WL 2812049, at *21-*22.  Also, Majer acknowledges that "the Court granted summary judgment to the attorney on other grounds."  (Pl.'s Br. at 44.)  The Third Circuit Court of Appeals affirmed the summary judgment ruling without mentioning the "color of state law" issue.  Dev. Group, LLC v. Franklin Twp. Bd. of Supervisors, 162 Fed.Appx. 158, 159-61 (3d Cir. 2006).

"cannot be held to have conspired with his or her client when the attorney's actions were conducted within the scope of the attorney-client relationship and 'for the benefit of the client rather than for the attorney's sole personal benefit.'"  Willis, 2008 WL 644762, at *5 (citations omitted).  We accordingly agree that Majer's apparent "assertion that defendant Shackleton acted jointly with state actors simply by performing legal services for his client is untenable."  (Defs.' Reply Br. at 9-10.)

It appears, however, that a municipality's attorney becomes a state actor by going beyond the traditional attorney-client relationship.  For instance, a plaintiff states a viable § 1983 claim against an attorney who goes beyond making recommendations and decides official government policies.  See Frompovicz v. Twp. of S. Mannheim, No. 06-2120, 2007 WL 2908292, at *8 (M.D. Pa. Oct. 4, 2007) ("Establishing the criteria for permit applications and evaluating those applications are clearly activities that have their source in state authority.  Defendant [attorney], in establishing the standards by which to judge permit applications, would in all fairness be considered a state actor.  He carried out a duty mandated under local government authority, establishing standards that applied under local law."); see also Willis, 2008 WL 644762, at *6 (characterizing Frompovicz as "holding that a township solicitor acted under color of state law when he exercised policy-making authority").

20

Shackleton contends he did nothing more than provide legal services.  (Defs.' Br. at 31-37; Defs.' Reply Br. at 9-15.)  Many of his actions, standing alone, appear to be consistent with the conduct of a private attorney representing a governmental client, such as drafting proposed legislation for the governing body's review.  (See, e.g., Shackleton Dep. at 29.)  Nevertheless, we agree with Majer that the motion for summary judgment must be denied as to the "color of state law" requirement.  We do so because the record reveals factual disputes as to what exactly was said and done regarding the termination of the "Sign Trial" at the September 29, 2005 meeting.

It is uncontested that a meeting was held on September 29, 2005 at Shackleton's law office — attended by Majer, Shackleton, Rowen, and Majer's then-attorney — to address Majer's concerns.  (See Majer Dep. at 141-47; Shackleton Dep. at 13-17.)  The issue of signage and the "Sign Trial" was addressed, and — according to Shackleton — (1) the participants reached an "understanding", and (2) "as a result of that meeting, I think the sign ordinance was amended."  (Shackleton Dep. at 16.)  According to Shackleton, there was an agreement "[t]hat Mr. Majer would comply with the ordinances of the township and that the township would enforce the ordinances as to everyone in the town the same as they enforced them as to Mr. Majer."  (Id. at 21.)  Also, this exchange occurred as to whether Shackleton himself revoked the Sign Trial at the meeting:

21

```
     Q.   All right.  Do you recall revoking the open house
          sign trial or recommending the revocation of the open
          house sign trial in or around September of 2005?
     A.   Well I know I never revoked it because I wouldn't
          have the power to revoke it.  I may well have told
          them that I thought it was an illegal act and should
          never been promulgated.
     Q.   Who would you have told that to?
     A.   The governing body.
     Q.   The governing?
     A.   The governing body.
```

(Id. at 26.)  Finally, Shackleton denied that he thought that "the

placement of open house signs off property posed a safety hazard."

(Id. at 27.)  Based on Shackleton's deposition testimony, it can

be reasonably contended that he did not unilaterally revoke the

Sign Trial at the September 29, 2005 meeting.  (See, e.g., Defs.'

Reply Br. at 13 ("the Sign Trial was discontinued on October 4,

2005 by way of official notice from the Township's Department of

Construction and Zoning").)

     Majer has a different account of what was said and done on

September 29, 2005.  (See, e.g., Pl.'s Br. at 45.)  Majer

testified that (1) "it was decided at that meeting to ban all

open house signs since they might blow in the wind and strike

pedestrians", and (2) Shackleton believed that open house signs

should be banned because of safety concerns.  (Majer Dep. at 99,

141-42.)  Rowen then tried to interject, but "Shackleton decided

that he [Rowen] should send a letter to all Realtors banning open

house signs, for rent or for sale."  (Id. at 142.)  When asked

about whether the Board of Commissioners approved the letter,

Majer stated that the letter was not approved because "I don't

believe there was any meeting on that." (<u>Id.</u>)  He added that:

> His [Shackleton] reason being that he did not want me
> to feel discriminated against, so he was just going to
> ban all signs.  He acted like he had the authority and
> someone questioned his authority, and he said do I need
> to write a letter to the mayor, or will you just send
> out the letter to the Realtors and to whomever.  So to
> me it was a done deal at that meeting.

(<u>Id.</u> at 142-43.)  Majer made another statement at his deposition

as to his understanding of Shackleton's role in the community:

> Mr. Shackleton seemed to – to me appeared to be running
> the township, and at one point when Mr. Rowen did
> question whether they should ban all signs, Defendant
> Shackleton says just do it.  If you want to, I'll get a
> letter from the mayor.  So it appeared to me that the
> mayor might be rubber stamping whatever it is Mr.
> Shackleton might be doing.

(Siegler Certif., Ex. C, Majer Dep. at 326-27.)

Majer's account of the meeting presents an attorney who did

not merely provide legal advice and services to his client, but

who went beyond the usual attorney-client relationship and, even

if lacking the requisite legal powers, became a <u>de facto</u> municipal

decision-maker by rescinding a program established by a former

Long Beach Township Mayor over the objection of a municipal

employee.  In turn, this alleged unilateral decision was

implemented with a letter notifying real estate brokers of the

termination of the "Sign Trial" itself, all without any apparent

vote by the Board of Commissioners.  Although it is argued that

"Plaintiff's attempt to create a fact issue through his own

23

'impressions' must be rejected" (Defs.' Reply Br. at 13), Majer offered more than mere "impressions" of the meeting, and it is for the ultimate finder of fact to decide between the different accounts contained in the record.

Additional considerations point to the existence of genuine factual disputes barring summary judgment in Shackleton's favor. Shackleton has served as the Municipal Attorney since 1976 and, before that time, served on the Township Board of Commissioners. (See, e.g., Pl.'s Br. at 44-45; Shackleton Dep. at 9-13.)  While Shackleton's history with Long Beach Township is not itself dispositive, and may merely indicate that officials valued his services (see, e.g., Defs.' Reply Br. at 11-12), such a long history with a single client does appear to raise an issue of fact whether Shackleton made policy determinations.

The current Mayor testified that, while she probably was briefed by Shackleton after the meeting, she could not "recall" either the October 4, 2005 letter notifying real estate brokers that the "Sign Trial" was being terminated or whether she had "any input into the decision to stop" the program.  (Gove Dep. at 26-29.)  While testifying that she would "have had input into" a decision of this "magnitude," Gove "honestly" could not recall any "conversations" with Shackleton or others or whether "the commissioners took a vote on this particular issue."  (Id. at 29.)  Bayard also was unable to remember much about the

24

termination of the "Sign Trial," testifying that he did not recall seeing the October 4, 2005 letter, discussing the policy change, or voting on the change itself.  (Tallmadge Aff., Ex. JJ, Bayard Dep. at 21-23.)

The testimony of one of the municipal employees attending the meeting also calls into question the Moving Defendants' theory that Shackleton merely "advised plaintiff that he would recommend that the Township discontinue" the Sign Trial.  (Defs.' Br. at 35.)  Rowen testified that:

> I believe that the decision that was made as far as the signs were concerned was Mr. Shackleton said, We don't want to treat anybody unfairly, so we are going to notify the real estate brokers that they were no longer going to be allowed to conduct open houses and put signs in the township's right of way.

(Rowen Dep. at 41.)  While he denied voicing any concern on this plan, Rowen's account could be read to support Majer's assertion that Shackleton himself made the termination decision at the meeting.  Furthermore, Rowen's superior, Pingaro, stated at his deposition that Rowen told him after the meeting that the Sign Trial had been revoked "because it wasn't an official ordinance resolution."  (Pingaro Dep. at 53.)

The claims against Shackleton remain viable at this time based on the factual disputes regarding the September 29, 2005 meeting and the revocation of the Sign Trial.  We find, however, that Shackleton cannot be liable with respect to the drafting or enactment of Ordinance No. 05-30C.  There is no genuine factual

issue that he was acting as an attorney in drafting it for possible enactment by the governing body, and even if he had stepped into a role as decision-maker with regard to its enactment, he would be protected by legislative immunity for that conduct.  <u>See</u> Point IV.A. <u>infra</u>.

**B.  The Litigation Privilege**

Shackleton further argues that he is protected by New Jersey's litigation privilege.  (<u>See, e.g.</u>, Defs.' Br. at 37-40; Defs.' Reply Br. at 15.)  However, we must reject the litigation immunity arguments at this time.

It is unclear whether this state-created immunity doctrine applies to a claim under § 1983, which the Moving Defendants acknowledge.  (Defs.' Br. at 37.)  However, district courts and the New Jersey Supreme Court have applied it to federal claims, including those brought pursuant to § 1983.  <u>See, e.g.</u>, <u>Brennan v. Palmieri</u>, No. 07-4364, 2008 WL 5233782, at *3 & n.6 (D.N.J. Dec. 12, 2008); <u>Sakhrani v. Escala</u>, No. 05-4746, 2006 WL 2376746, at *5-*6 (D.N.J. Aug. 16, 2005); <u>Loigman v. Twp. Comm. of Middletown</u>, 185 N.J. 566, 577-85 (2006).  Majer also does not argue that the privilege is inapplicable in this setting.  We assume, without deciding, that the state litigation privilege may be applied to § 1983 claims.

We nevertheless find that factual issues preclude granting summary judgment in Shackleton's favor.  The litigation privilege protects an attorney from liability for statements made in the

course of judicial or quasi-judicial proceedings.  See, e.g.,
Loigman, 185 N.J. at 585.  Shackleton argues that he is entitled
to immunity because his various statements, including those at the
September 29, 2005 meeting, were made as an attorney representing
Long Beach Township in a quasi-judicial proceeding.  (See, e.g.,
Defs.' Br. at 37-40; Defs.' Reply Br. at 15.)  However, as noted
by Majer (see, e.g., Pl.'s Br. at 48), there are issues of material
fact as to whether he was acting as a mere advocate for his client,
and it is also unclear whether that meeting can be described as a
quasi-judicial proceeding.

**IV.  Immunity Doctrines**

Gove and Bayard, as Mayor and Township Commissioner, argue
that they are entitled to legislative immunity, and that they,
together with Rowen and Pingaro, are also entitled to qualified
immunity.  (See, e.g., Defs.' Br. at 24-30, 40-44; Defs.' Reply
Br. at 5-9, 15-24.)  Because we find that the prerequisites for
legislative immunity were met here, we grant summary judgment as
to Majer's individual-capacity claims under federal law against
Gove and Bayard.  However, we find that genuine issues of
material fact preclude summary judgment in favor of Rowen and
Pingaro on the basis of qualified immunity.

**A.  Legislative Immunity**

Members of local legislative bodies may be entitled to
absolute legislative immunity as to individual-capacity claims
against them.  See, e.g., County Concrete Corp.  v. Twp. of

27

Roxbury, 442 F.3d 159, 172 (3d Cir. 2006); Carver v. Foerster, 102 F.3d 96, 99 (3d Cir. 1996); Acierno v. Cloutier, 40 F.3d 597, 610 (3d Cir. 1994); Ryan v. Burlington County, 889 F.2d 1286, 1290 (3d Cir. 1989). But "'[i]t is only with respect to the legislative powers delegated to them by the state legislatures that the members of local governing boards are entitled to absolute immunity.'" Acierno, 40 F.3d at 610 (quoting Ryan, 889 F.2d at 1290). Pursuant to Acierno: "(1) the action must be 'substantively' legislative, which requires that it involve a policy-making or line-drawing decision; and (2) the action must be 'procedurally' legislative, which requires that it be undertaken through established legislative procedures." Id. at 610 (citing Ryan, 889 F.2d at 1290-91); see Baraka v. McGreevey, 481 F.3d 187, 197-99 (3d Cir.), cert. denied, 128 S.Ct. 612 (2007).

    It appears uncontested that the enactment of Ordinance No. 05-30C satisfied the established legislative procedures. Majer argues there are genuine issues of material fact as to whether the actions of Gove and Bayard were substantively legislative. (See, e.g., Pl.'s Br. at 56-59.) This municipal ordinance, which was in force for three months, permitted "Open House - For Sale" signs but banned "Open House - For Rent" signs. (See, e.g., Ordinance No. 05-30C; Ordinance No. 06-04C.) According to Majer, "the amended ordinance affected only one person, Mr. Majer" because "[a]ll of the Township officials conceded that Mr. Majer's signs were the only ones like it any of them had ever seen." (Pl.'s

28

Br. at 57-58 (citations omitted).)   Therefore, the Board of
Commissioners allegedly committed an executive or administrative
act by retaliating against a single individual for his persistent
complaints.   (See, e.g., id. at 58.)   Majer further contends that
Gove was acting in her administrative or executive capacity as
the Commissioner in charge of the Zoning Department when she met
with subordinates "to decide how to fix the problems caused by
Mr. Shackleton's unilateral decision to revoke the Open House
Sign Trial" and then decided to deal with rental signs "by
banning them altogether, knowing full well that Mr. Majer was the
only one who ever used 'Open House – For Rent' signs."  (Id. at
58 (citations omitted).)   We conclude, however, that both Gove
and Bayard are entitled to legislative immunity.

     As the Moving Defendants emphasize and Majer himself does
not contest (see, e.g., Defs.' Br. at 27; Defs' Reply Br. at 6),
the mere fact that a particular action affects a small group of
people or even a single individual does not conclusively show
that it is administrative or executive in nature.   The court in
Ryan v. Burlington County, 889 F.2d 1286 (3d Cir. 1989), stated
that, "[w]here the decision affects a small number or a single
individual, the legislative power is not implicated, and the act
takes on the nature of administration." Id. at 1291.  In Acierno,
the court observed that the inquiry of whether an action affects
a single individual or a small number of people "is an appropriate

29

factor to consider when determining whether an action is
legislative or administrative." Acierno, 40 F.3d at 610.[2]  On
the other hand, the Acierno court said that "we have not held
this inquiry to be conclusive." Id.  It therefore rejected the
district court's exclusive reliance on this factor in its
immunity analysis, while adding that "[i]t is difficult to find
fault with the district court . . . because we concede that the
prior decisions of this court are somewhat unclear." Id. at 611.

     The court ultimately held that, although a county council's
enactment of an ordinance voiding the plaintiff's already
approved development and subdivision plans was an administrative
action, its passage of an ordinance "down-zoning" the plaintiff's
property (and only the plaintiff's property) was substantively
legislative in nature.  Id. at 612-13.  The court offered the
following explanation of its earlier statement in Ryan:

          However, we did not intend this consideration as a
          bright-line rule which automatically overrides other
          important indications that an action is substantively
          legislative in character.  Rather, we intended this
          consideration as a factor that is usually important but
          may not be dispositive of the administrative/ legislative
          outcome.  This reading of Ryan is confirmed by the manner
          in which the Ryan court applied its test.  While noting
          that the decision at issue "did not affect the community
          as a whole," the court went on to state that "[t]his is a
          strong indication that legislative line-drawing was not

     _____

     [2]  The Acierno decision was an en banc ruling as to the
appealability of a qualified immunity ruling.  However, the
"issues addressed in the remainder of th[e] opinion have been
considered by the panel only," including the application of the
legislative immunity doctrine.  40 F.3d at 600.

> implicated."  Therefore, the <u>Ryan</u> court itself did not
> apply the factor that the decision was directed at a
> single individual or a small group as a dispositive
> consideration which trumps other relevant factors.

<u>Id.</u> at 612 (citation omitted).  Since the <u>Acierno</u> decision, the
Third Circuit Court of Appeals has continued to treat the number
of persons affected by a particular action as an important but
not necessarily dispositive factor in the immunity inquiry.
<u>Gallas v. Sup. Ct. of Pa.</u>, 211 F.3d 760, 774 n.14 (3d Cir. 2000)
("[W]e did not mean to imply [in <u>Ryan</u>] that a legislative body,
passing a de jure law affecting only a single person, would not
be entitled to legislative immunity."); see <u>Baraka</u>, 481 F.3d at
198 & n.7.

    That the Long Beach Township Board of Commissioners passed
an ordinance that allegedly "affected" only Majer does not
necessarily demonstrate that the ordinance itself failed the
substantive prong of the legislative immunity inquiry.  The Moving
Defendants argue that, regardless of the number of residents
using "Open House – For Rent" signs, the Commissioners and others
"were concerned about future use of real estate signs in the
public right-of-way" and that Ordinance No. 05-30C itself was a
"forward-looking" example of "policy-making" and "line-drawing."
(Defs.' Reply Br. at 7-8.)  They also point to Majer's statement
that another neighbor posted the same kind of "Open House – For
Rent" signs.  (<u>See, e.g.</u>, <u>id.</u> at 6-7 (quoting Majer Dep. at 77-
79).)  Although it may be troubling, Ordinance No. 05-30C

appears comparable to such "substantively" legislative actions as
down-zoning property, see County Concrete Corp., 442 F.3d at 172;
Acierno, 40 F.3d at 612-13, or eliminating the position of — as
opposed to firing — a government employee.  See Bogan v. Scott-
Harris, 523 U.S. 44, 46, 55-56 (1998); Gallas, 211 F.3d at 775-76.

     Contrary to Majer's characterizations (see, e.g., Pl.'s Br.
at 56-59), the challenged enactment also does not affect only a
small number of people or one individual.  On its face, Ordinance
No. 05-30C prohibited anyone from posting "Open House – For Rent"
signs in the public right-of-way.  In the words of the Moving
Defendants, "Ordinance 05-30C merely modified an existing
ordinance applicable to all residents and business owners of the
Township," and, "legislatively speaking, [i]t applied to all
persons in the Township."  (Defs.' Br. at 26-27.)  It appears
that the legislation at issue is distinguishable from the zoning
ordinance addressed in Acierno, which expressly re-zoned the
plaintiff's property.  Acierno, 40 F.3d at 604.  For instance,
the Board of Commissioners did not pass an ordinance forbidding
only certain enumerated properties (or individuals) from putting
up "Open House" signs.  Admittedly, a reasonable finder of fact
could find from the surrounding circumstances that the governing
body sought to single out and punish Majer for his protected
activities and used the unusual distinction between "Open House –
For Rent" and "Open House – For Sale" signs to do so.  But a

court generally may not take into account the official's motive
or intent in the legislative immunity inquiry.  See, e.g., Bogan,
523 U.S. at 973 ("Whether an act is legislative turns on the
nature of the act, rather than on the motive or intent of the
official performing it. . . . We therefore held that the defendant
in Tenney had acted in a legislative capacity even though he
allegedly singled out the plaintiff for investigation in order
'to intimidate and silence plaintiff and deter and prevent him
from effectively exercising his constitutional rights.'" (quoting
Tenney v. Brandhove, 341 U.S. 367, 371 (1951) (emphasis omitted)));
Baraka, 481 F.3d at 200 ("In [plaintiff's] view, the intent and
motive behind the purpose of the repealer was perceived anti-
Semitism.  But a defendant's intent and motive are immaterial to
whether certain acts are entitled to legislative immunity."
(citing Bogan, 523 U.S. at 54-55)).  Here, the "nature" of the
ordinance itself points to an exercise of municipal policy-making.

     For the above reasons, we conclude that there are no genuine
issues of material fact as to whether Ordinance No. 05-30C met the
requirements for immunity.  The "doctrine of absolute immunity .
. . does not shield executive officials from liability for a
course of conduct taken prior to and independent of legislative
action, even if those officials were simultaneously members of
the local legislative body that ratified the conduct."  Carver,
102 F.3d at 102; see Baraka, 481 F.3d at 195-97 (finding governor

and chairperson of state arts council were immune for advocating
and promoting legislation abolishing plaintiff's position).
However, we do not accept Majer's legally unsupported argument
that prior discussions with administrative staff render the
entire amendment process itself non-legislative in nature.  We
conclude that Gove's meetings with the Zoning Department staff to
discuss the issues that had arisen because of the Sign Trial's
revocation fall under the immunity doctrine insofar as they
resulted in legislative and not executive action.  (See, e.g.,
Defs.' Reply Br. at 8.)

     We therefore will grant the motion as to Majer's individual-
capacity § 1983 claims against Gove and Bayard.  We note that the
Moving Defendants do not argue that the immunity doctrine or a
similar concept bars the claims against Long Beach Township
itself as to the allegedly retaliatory adoption of Ordinance No.
05-30C.  See, e.g., Carver, 102 F.3d at 102-05.  As we explain
infra, such claims must be allowed to go forward.

     **B.   Qualified Immunity**

     Rowen and Pingaro contend they are entitled to qualified
immunity on the grounds that they did not violate any clearly
established statutory or constitutional rights.  (See, e.g.,
Defs.' Br. at 40-44; Defs.' Reply Br. at 15-22.)  We conclude
that summary judgment on this basis must be denied.[3]

_____

     [3]  Gove and Bayard further contend that they are entitled to
qualified immunity.  (See, e.g., Defs.' Reply Br., at 22-24.)

Under the two-step inquiry for assessing qualified immunity:

> [First], the court must determine whether the facts alleged show that the defendant's conduct violated a constitutional or statutory right.  If so, the court must then determine whether the constitutional or statutory right allegedly violated by the defendant was "clearly established."  If the court concludes that the defendant's conduct did violate a clearly established constitutional or statutory right, then it must deny the defendant the protections afforded by qualified immunity.

Bayer v. Monroe County Children & Youth Servs., 577 F.3d 186, 191 (3d Cir. 2009) (quoting Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006)).  Courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Id. (quoting Pearson v. Callahan, 129 S.Ct. 808, 818 (2009)).

The parties disagree over the nature of the constitutional right (or rights) at issue here.  According to the Moving Defendants, "[t]he question is whether plaintiff had a clearly established right to display 'For Rent – Open House' signs at the time of the various enforcement actions."  (Defs.' Br. at 42; see Defs.' Reply Br. at 16.)  But Majer refers to "the right of a private citizen to engage in protected speech without fear of retaliation."  (Pl.'s Br. at 62.)  We must accept Majer's

---

We, however, need not consider whether these two individual defendants are entitled to qualified immunity because we have already determined that they are immune under the legislative immunity doctrine.

definition of the right at issue here.  For instance, we have already noted that the question of whether Ordinance No. 05-30C violates the First Amendment is not directly before this Court.  Instead, the Court must consider whether this ordinance and other alleged actions by the Moving Defendants constituted unconstitutional retaliation against a private citizen for exercising First Amendment rights.  Contrary to the Moving Defendants, "plaintiff's major gripe" is that they took action against him for speaking out about his neighbor and municipal misconduct.  (Defs.' Reply Br. at 16.)

We have already concluded that Majer raises genuine issues of material fact as to a constitutional retaliation claim.  Rowen and Pingaro defend at some length their alleged actions.  (See, e.g., Defs.' Br. at 41-44; Defs.' Reply Br. at 17-22.)  For instance, they contend that they were merely enforcing Long Beach Township ordinances against a resident who persistently broke the rules and that they themselves did not act with any retaliatory motive or even with any personal knowledge of either E.J. Kelly or his brother.  (See, e.g., id.)  Nevertheless, we must "review the facts in the light most favorable to the plaintiff," Giles v. Kearney, 571 F.3d 318, 326 (3d Cir. 2009) (citations omitted), and, at least in the summary judgment context, "'this usually means adopting . . . the plaintiff's version of the facts,'" id. (quoting Scott v. Harris, 550 U.S. 372, 378 (2007)).  In his

36

qualified immunity discussion, Majer alleges several retaliatory acts committed by Rowen and Pingaro. (Pl.'s Br. at 60-61.) For instance, he alleges that (1) Pingaro confiscated Majer's signs without notice or cause, which he had not done before and has not done since, (2) Rowen manufactured the Notice of Violation form specifically for Majer, (3) Rowen expedited E.J. Kelly's zoning complaints about Majer, (4) Pingaro questioned Majer's use of a guest apartment and Rowen threatened to raise his taxes, and (5) Rowen sent Majer a Notice of Violation, while ignoring other violations. (Id.; see, e.g., Pingaro Dep. at 35-37.) While the Rowen and Pingaro do offer plausible explanations for their various alleged acts (see, e.g., Defs.' Reply Br. at 17-22), we must conclude that Majer has produced evidence tending to show that Rowen and Pingaro violated a constitutional right.

We consider next whether this violated right was clearly established. "'The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official or employee] that his conduct was unlawful in the situation he confronted.'" Bayer, 577 F.3d at 192 (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)). Thus, the Court must apply this prong in the specific factual context confronting the government employee. See id. The Moving Defendants argue that the right to display an "Open House – For Rent" sign was not clearly established, contending that there was

37

a conflict between the Sign Trial and Long Beach Township's own ordinances, Pingaro testified in his deposition that he was not aware of the Sign Trial, and Rowen indicated that he believed that the Sign Trial was inapplicable to private homeowners such as Majer. (See, e.g., Defs.' Br. at 42-43.)  However, we are concerned here with a private citizen's right to be free from unconstitutional retaliation.  It appears uncontested that the law governing retaliation is clearly established.  Given our analysis of the retaliation claims, we further determine that a reasonable government employee would have believed that the actions at issue here were constitutionally improper.  Therefore, neither Rowen nor Pingaro are entitled to qualified immunity based on the "clearly established right" prong of the inquiry.

**V.   Municipal Liability**

We must address whether Long Beach Township itself may be held accountable for the alleged unconstitutional conduct.  The Moving Defendants argue that Majer fails to raise a genuine issue of material fact as to the existence of a municipal policy or custom of retaliation against him.  (See, e.g., Defs.' Br. at 44-47; Defs.' Reply Br. at 24-25.)  Given the passage of Ordinance No. 05-30C by Long Beach Township's own governing body, we find that there are, at the very least, factual issues as to the municipality's liability.

A municipality cannot be held liable under § 1983 for the acts of its employees under the theory of respondeat superior. See, e.g., Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).  However, a municipality may be held liable where the constitutional deprivation is caused by a municipal "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  Id. at 694.  The Moving Defendants recognize that "[t]he term 'official policy' usually refers to formal governmental rules or practices."  (Defs.' Br. at 44 (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986)).)  "Under appropriate circumstances, however, a single act or decision by a municipal policymaker can impute liability to the municipality."  (Defs.' Br. at 44-45 (citing Pembaur, 475 U.S. at 479).)

Majer asserts he has "marshaled" ample evidence in support of his claim that Long Beach Township had a policy or custom of retaliating against him for exercising his right to free speech. (Pl.'s Br. at 63.)  He goes so far as to argue that this evidence shows "that he has suffered adverse and retaliatory actions from practically every branch and department of the Township – the DPW [Department of Public Works], the [Zoning Department], the Township Police Department, the Long Beach Island Health Department, the Mayor's Office, the Board of Commissioners, and the Township Attorney – not to mention the individual employees thereof."  (Id.

39

at 63 (citations omitted).)   The Moving Defendants take issue
with Majer's admittedly sweeping assertions.  (See, e.g., Defs.'
Br. at 44-47; Defs.' Reply Br. at 24-25.)   We, however, need not
explore all of the contentions raised by the parties because a
municipality may be held liable for, at the very least, the
enactment of a municipal ordinance by its actual governing body.

One of the allegedly retaliatory acts was the adoption of
Ordinance 05-30C by the Board of Commissioners.  A municipal
ordinance constitutes, in the Moving Defendants' own words, a
"formal government rule[] or practice[]."  (Defs.' Br. at 44.)
The Moving Defendants also do not contend that the legislative
immunity doctrine protects a municipality from liability.  They
do defend the constitutionality of Ordinance No. 05-30C itself.
(See, e.g., Defs.' Br. at 46-47.)  They further contend that
"plaintiff offers no evidence that the enactment of the ordinance
by the Commissioner defendants caused him to sustain any
damages."  (Id. at 45-46.)  But, even if it otherwise does not
violate the First Amendment (an issue not before this Court),
there are genuine issues of material fact as to whether Ordinance
05-30C constitutes an unconstitutional retaliatory act against
Majer himself.  As to the question of damage, we reject this
argument insofar as the ordinance itself did remain in effect for
more than three months, and Majer himself was the target of
enforcement action over this period of time because of the
ordinance.  (See, e.g., Summons.)

40

**VI.   State Law Claims**

Majer also advances claims against the Moving Defendants pursuant to the civil conspiracy doctrine and the New Jersey Civil Rights Act.  The parties themselves generally focus on the federal causes of action, with the Moving Defendants specifically arguing that the state law conspiracy claim is without merit because the underlying claims themselves lack merit or are barred by an immunity doctrine.  (See, e.g., Defs.' Br. at 58-59; Defs.' Reply Br. at 28.)  Given the parties' focus on federal law, we will generally deny the motion for summary judgment as to the remaining state law claims.  Because of legislative immunity, we will grant summary judgment in favor of Gove and Bayard as to the individual-capacity claims under state law.

CONCLUSION

We will grant the summary judgment as to the individual-capacity claims against Gove and Bayard.  As to the remaining claims and issues, the motion for summary judgment will be denied.  The Court will issue an appropriate order and judgment.[4]

s/ Mary L. Cooper

**MARY L. COOPER**
United States District Judge

**Dated:**  September 30, 2009

---

[4]  To the extent that it may be construed that claims remain against Gove and Bayard in their official capacities, such claims are deemed to be absorbed by the claims asserted against Long Beach Township.